370 So.2d 618 (1979)
Russell James TALLUTO
v.
Leo PATCHEN, Paul Donahue, and Robert Ballard.
No. 9903.
Court of Appeal of Louisiana, Fourth Circuit.
April 10, 1979.
Rehearings Denied May 17, 1979.
*620 Steven Plotkin, New Orleans, for plaintiff-appellee.
Deutsch, Kerrigan & Stiles, Robert E. Kerrigan, Jr., Philip D. Lorio, III, New Orleans, for defendants-appellants Leo Patchen, Robert Ballard and Transportation Insurance Co.
Sessions, Fishman, Rosenson, Snellings & Boisfontaine, James Ryan, III, New Orleans, for defendant-intervenor-appellant Transportation Insurance Co. as the Workmen's Compensation Insurer of Martin Marietta Corp.
Before REDMANN, LEMMON and GARRISON, JJ.
GARRISON, Judge.
Russell Talluto, plaintiff in this matter, injured his wrist on March 5, 1976 when he and a co-worker attempted to lift and move a heavy table pursuant to instructions from their supervisor. Plaintiff filed an action in tort against certain "executive officers" of his employer, Martin Marietta Corporation, and against their liability insurer.[1] He sued alternatively to receive workmen's compensation benefits.[2] The tort defendants (Leo Patchen, Paul Donahue, Robert Ballard and Continental Casualty Company) denied liability, asserting no negligence or, in the alternative, that plaintiff had been contributorily negligent and/or had assumed the risk. The workmen's compensation insurer (Transportation Insurance Company) intervened for reimbursement of benefits paid.
The nonjury trial took place on December 21 and 22, 1977. The judgment rendered, in substance, was as follows:
(1) Plaintiff's claim against Paul Donahue was dismissed;
(2) Judgment was rendered in favor of plaintiff and against Leo Patchen, Robert Ballard and Continental Casualty Company (incorrectly named in the judgment as Continental Nation American Insurance Company) in the amount of $283,650.00 plus legal interest and all costs;
(3) Judgment was rendered in favor of Transportation Insurance Company and against Patchen, Ballard and Continental Casualty for reimbursement of both past and future workmen's compensation benefits paid or payable to plaintiff as well as for medical expenses;
(4) Plaintiff was decreed to be entitled to workmen's compensation benefits for permanent total disability in the amount of $85.00 per week during the entire period of his disability;
(5) Plaintiff's demand for statutory penalties and attorney's fees in connection with his workmen's compensation claim was dismissed; and
(6) The three expert witnesses were awarded fees of $300.00 each, to be taxed against defendants.
Defendants Patchen, Ballard and Continental Casualty have appealed, assigning as error the following: the trial court's failure to find that plaintiff had assumed the risk and/or was contributorily negligent; the trial court's award of future lost wages to *621 plaintiff; and the trial court's award of damages to plaintiff for pain and suffering in the amount of $120,000 (alternatively, that such award is excessive).
Defendant-intervenor Transportation Insurance Company has appealed the trial court's determination that plaintiff is totally and permanently disabled and thereby entitled to maximum workmen's compensation benefits. Because we adjudicate the merits of the demand against the third party and fix Transportation Insurance's rights under its intervention (which essentially involves merely a credit against the amount of the tort judgment, since Transportation Insurance and Continental Casualty are interrelated companies), and because Transportation Insurance has been paying maximum weekly benefits at time of trial and had paid all benefits due, it is not necessary that we specifically address the issue raised by Transportation Insurance's appeal.

FACTS
At the time of the accident Russell Talluto was 30 years old, 5 feet 9½ inches tall and weighed approximately 170 pounds. He had a high school education and had completed almost two years of college. He had been working at Martin Marietta as a spray foam insulation mechanic for about 1½ years, and before that had worked both as an insurance inspector and in a clerical capacity for the Small Business Administration.
The accident occurred at approximately 3:30 p. m. on March 5, 1976. Talluto and Rumore had been ordered by Lew Patchen, their supervisor, to move two large tables[3] which had been delivered to their working area, one table face-down atop a similar table. The tables were placed with one side against a wall; one end was next to, but about 2 or 3 inches from, some cabinets. The other side and end were open and accessible, although located nearby was a post extending from the floor to the ceiling. Both Talluto and Rumore asked Patchen for either a forklift truck or additional personnel to help move tables. Patchen responded that no help was available and emphatically ordered them to move the tables immediately. Although both men were aware that they had the right to call for a union shop steward and a representative from the safety department if they felt the job was unsafe, neither made such a request. In addition, although they knew that either of them could have ordered a forklift truck from the Transportation Department on his own, neither man did this because they felt that no forklift would be delivered so close to the end of the shift.[4]
After Patchen denied their request for assistance, the men proceeded to attempt to move the top table. Without discussing in advance how they would handle it, they positioned themselves at either end of the top table and attempted to pick it up. Rumore, who was standing at the end of the table next to the cabinets, stated that he grasped the leg of the table farthest from the wall with his left hand and crossed his right hand over to grasp the leg closest to the wall. It was his intention to "flip" the table over. He did not notice how Talluto grasped it. Talluto himself could not remember exactly how he grasped the table. However, as he and Rumore attempted to lift it, it slipped and fell on his hand and wrist.
Although Talluto apparently was in considerable pain immediately after the accident, he did not get medical treatment right away because it was late on a Friday afternoon. Instead, he waited until Monday morning, at which time he went to Dr. Lothschuetz, the company doctor. After two visits to Dr. Lothschuetz, Talluto was referred to Dr. Segura, who gave the injury conservative treatment. When it continued *622 to worsen after two or three visits, Dr. Segura referred Talluto to Dr. Harry Hoerner, an orthopaedic surgeon.
Dr. Hoerner X-rayed Talluto's wrist, but could find no fractures. He initially diagnosed the injury as a sprain to the wrist, and continued conservative treatment by application of a splint and resting the wrist. Talluto returned to Dr. Hoerner for followup visits at intervals of approximately three weeks. When he continued to complain of pain and swelling in his wrist, Dr. Hoerner prescribed anti-inflammatory medication. By the end of June 1976, Talluto still complained of pain and Dr. Hoerner injected cortisone into the tender area of the wrist, because Talluto had stated that the oral medication hadn't helped and the doctor did not want to continue oral steroids because of possible side effects.
When Talluto returned to Dr. Hoerner in mid-July, still complaining of pain and tenderness in the wrist, the doctor diagnosed a DeQuervain's Syndrome[5] and recommended surgery to explore the wrist and release the tendons. This surgery was performed on August 3, 1976 to release the extensor tendons of the thumb, explore the area and biopsy local tissue.
Following the operation Talluto continued to see Dr. Hoerner for examinations every few weeks. He still complained of pain and limited motion in his wrist. He was taking an anti-inflammatory medication and had been advised by the doctor to exercise his wrist. After his November 1, 1976 visit, Dr. Hoerner gave Talluto a qualified return-to-work permit. However, on December 1st, when Talluto complained of increased pain and inability to use his hand and wrist, Dr. Hoerner advised him not to work for four weeks more, but to return to work in January. (We note that Talluto had not returned to work since his injury).
When Talluto came for his January 12, 1977 examination, Dr. Hoerner advised him that he could do light work using his right hand. Because Talluto still persisted with complaints of pain, Dr. Hoerner referred him to Dr. Ray Haddad. Dr. Haddad felt that the superficial branch of the radial nerve was tied up in the scar and that this was causing the pain and tenderness. Dr. Haddad recommended blocking the nerve to obtain temporary relief, and possibly surgery (resection of the nerve itself).
When Talluto saw Dr. Hoerner on March 30, 1977, Dr. Hoerner advised him that he could return to work. On May 11th Dr. Hoerner injected the nerve in Talluto's hand to block it, which gave Talluto temporary relief. When Talluto returned on May 23rd his complaints were the same, however, and these continued through the visit of June 20th. At that time Dr. Hoerner concluded that he needed additional surgery to resect the nerve and to explore the wrist.
On June 27, 1977 Talluto was admitted to the hospital with a diagnosis of neuroma (scarring) on the superficial radial nerve of the right wrist. Surgery was performed the following day, and approximately six to seven inches of nerve removed from Talluto's forearm. As a result, Talluto now suffers a loss of sensation to the top portion of the thumb and half of the top of the hand, because the sensory nerve is gone.
After the second operation, Talluto continued to see Dr. Hoerner at three- to four-week intervals. He still complained of limited motion and tenderness over the scar and had permanent loss of sensation over the nerve distribution. Dr. Hoerner listed his final diagnosis as "a sprain to the ligaments of his right wrist with a contusion of the extensive tendon resulting in DeQuervain's Syndrome and neuroma of the superficial branch of the radial nerve." He attributed the injury to Talluto's hand being crushed or squeezed between the two tables, and estimated that Talluto would have a permanent partial disability of 15% To 20% of the right extremity.
As of the date of trial, Talluto was still complaining of inability to close his fingers and grip, write with his right hand for long periods, and dress himself with his right hand; he continued to complain that he had *623 pain in his wrist, that it swelled when he attempted to lift heavy objects, and that he could not bend or flex the wrist. Dr. Hoerner could give no medical justification for these complaints, but felt they could be improved with active use of the hand and wrist.
As previously stated, plaintiff underwent two separate operations on his wrist, the first one to release the swollen tendons and the second one to excise a nerve that had been caught up in scar tissue. As a result of the second operation, plaintiff has a permanent loss of sensation on part of the back of his right hand. Talluto testified at trial that he could not grasp with his right hand or perform fine movements with it, such as shaving or writing for long periods. He also testified that he could not squeeze a trigger or lift heavy objects, such as would be required if he returned to his former occupation as a spray foam insulation mechanic. However, he admitted that he had not attempted to return to work since his injury.
Dr. Hoerner, whose expert testimony was the only expert medical evidence offered at trial, testified that plaintiff had a 15-to-20 percent permanent partial disability of his right extremity. However, Dr. Hoerner could give no medical explanation for the lingering manual disabilities claimed by plaintiff. He felt that the disability would decrease with active use of the hand, and he also felt that plaintiff could return to his former job duties as described by plaintiff on the witness stand. He felt that plaintiff could not perform heavy manual labor; nonetheless, the doctor could not explain why plaintiff apparently could not perform fine movements with his fingers. Dr. Hoerner also stated that he felt plaintiff was "overreacting" to examination of the sensitive area.
Talluto's own testimony was the only evidence in support of his claims that he could not perform his job duties. His second operation had taken place approximately six to seven months before trial. However, he had not attempted to return to work, either before or after that operation.

LIABILITY
In his oral Reasons for Judgment the trial court concluded that Patchen was negligent "in ordering this large benchtype table to be moved by two men." Patchen's immediate supervisor, Ballard, was also found negligent in failing to advise Patchen "to have the proper manpower and/or mechanical equipment to take off the large table in question for its removal to another part of the building." As mentioned above, the precise weight of the tables was never shown at trial, other than through estimates. However, from the photographs of the tables, from their position close against a wall and a set of cabinets, from the report of the Martin Marietta Safety Engineer that the table weighed 250 pounds, and from the testimony of a safety expert presented by plaintiff, we concluded the tables were too heavy and in too awkward a position for two men to handle safely.
A safety expert, who had 32 years of fulltime safety work with a large compensation insurer, opined that two men could not handle the table safely because of its weight and of the awkward conditions of having limited access on two sides. He stated that several labor and governmental groups used the figure of 88 pounds per man as the maximum safe weight to handle, but depending on circumstances he used the figure of 50 pounds per man as that which "would likely not produce injuries and therefor losses." He concluded that Patchen's conduct as a supervisor was substandard because he had the responsibility to see that the employees were provided with a safe method to perform work with safe equipment under the circumstances, and that it was imprudent to act on expediency rather than to postpone completion of the task until it could be performed under safer circumstances.
Furthermore, the accident report by plaintiff's employee's senior safety engineer stated that the "work bench was too heavy and awkward for two people to handle."
This evidence furnishes adequate support for the findings of the trial judge, and, *624 accordingly, we affirm the finding of negligence on the part of Patchen. Canter v. Koehring, 283 So.2d 716 (La.1973); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), reh. den., January 26, 1979. However, there is no evidence that Ballard participated in the rash decision to require completion of the task under circumstances involving substantial risk of injury or that he was negligent in delegating responsibility for safe completion of the task to Patchen. Accordingly, the determination that Ballard was liable must be reversed.

PLAINTIFF'S CONTRIBUTORY NEGLIGENCE/ASSUMPTION OF THE RISK
It is clear from the record that both Talluto and Rumore felt it was unsafe for the two of them alone to move the tables. Not only had they requested additional assistance from Patchen, but also they both testified at trial that they felt the tables were too heavy. Both men were aware that they had the right to call for a unionshop steward and a representative from the safety department to inspect the job if they felt it was unsafe. In addition, they could have ordered a forklift truck on their own. However, neither man made any such requests, nor did they, before attempting to move the tables, discuss in what manner they would handle them. Talluto testified that they did not call the Safety Department because it was late in the day and by the time a safety man came in,
"[I]t would have been overtime and we couldn't work overtime, and probably a reprimand and plus he said he wanted them moved now."
Rumore who had been promoted to supervisor by time of trial, testified that they didn't call a safety man because
"[I]f something puts you in immediate danger of your life you can refuse and get safety down there. And my own experience, if it is not going to kill you right at the time it is best to do what your supervisor says because it is insubordination."
In contrast, defendants presented the testimony of Louis Tanner, who had been plaintiff's co-worker for a year-and-a-half. Tanner testified that he himself had in the past refused to perform tasks which he considered unsafe, and had not suffered any disciplinary repercussions. The first incident he described involved a refusal to work in a spray-painting booth in which the ventilation system was functioning improperly; in the second incident, he had refused to climb a ladder on top a tank, feeling it was unsafe because he was a large man. He also testified that in circumstances when he had been given an order to lift an object too heavy for him to handle he would usually get someone to help him. However, he admitted that he had never been in a situation similar to Talluto's (i. e., receiving a firm order to perform a task, near the end of the shift, for which he needed to order a forklift or additional help). Tanner testified that it was sometimes difficult to get a forklift near the end of a shift.
Defendants contend that Talluto was contributorily negligent and/or assumed the risk in attempting to lift a table that he felt was too heavy. They contend that although Patchen refused to obtain help for Talluto and Rumore, both men knew they had the right under their union contract and the rules and regulations of the company to demand further safety measures. Further, defendants aver that Talluto was contributorily negligent in attempting to lift the table in an unusually hazardous manner.
Plaintiff, on the other hand, denies that he was contributorily negligent, because he did request assistance from his supervisor. He contends that he had to follow Patchen's emphatic order that "I want them moved now" under company rules or he would have been subject to discipline for insubordination or to more subtle forms of punishment. Furthermore, the risk involved was not one which endangered his life, but one which encompassed danger from loss of grip or control and possible injury to an extremity (which is exactly what occurred).
*625 Both sides cite numerous cases in support of their positions. The trial judge, in his oral reasons for judgment, cited the cases of O'Keefe v. Warner, 288 So.2d 911 (La.App. 1st Cir. 1973), writ refused [293 So.2d 170] April 11, 1974, and Jones [Chaney] v. Brupbacher, 242 So.2d 627 (La.App. 4th Cir. 1970), for the proposition that plaintiff was not obligated to continue protesting the safety of the situation at the risk of reprimand or of losing his job. The O'Keefe case stated:
"[T]he appellants failed to prove contributory negligence or assumption of the risk on the part of O'Keefe. The duties of his work required him to be where he was, and he was doing his best to discharge those duties.
"We agree with the observation by Judge Redmann of the 4th Circuit in a somewhat similar situation:
"`. . . . a workman's superior cannot create or permit danger and send the workman into it with a warning and escape liability on a theory that the workman was contributorily negligent merely by going into the danger. The workman's only other alternatives are to try to tell his superior how to run the job, or to quit.' Chaney v. Brupbacher, 242 So.2d 627, at 631 (La.App. 4th Cir. 1970)." 288 So.2d at 914.
Defendants cite cases for the proposition that an employee who exposes himself to a known danger assumes the risk of such exposure and is guilty of contributory negligence if he suffers injury as a result thereof. In Pearson v. Hartford Acc. & Indem., 345 So.2d 123 (La.App. 1st Cir. 1977), writs refused June 30, 1977 [347 So.2d 255 and 347 So.2d 256], the court stated:
"If a workman performs his job in the face of an obvious danger, then he is contributorily negligent. But he is not to be judged as contributorily negligent just because he fails to stop, to analyze the possible alternatives and, with some superior wisdom, calculate the relative advantages and disadvantages of these alternatives before he acts. In other words, if the safe alternative is as readily available and as obvious to the workman as is the danger of not choosing it, then the workman is guilty of contributory negligence in performing the dangerous task." 345 So.2d at 127, 128.
The case of Miller v. Employers Mut. Liability Ins. Co. of Wisconsin, 349 So.2d 1353 (La.App. 2nd Cir. 1977), writ denied 352 So.2d 235, described the following factors for determining an employee's contributory negligence:
"Emerging as criteria for determining an employee's contributory negligence are: (1) relative knowledge of the danger by the supervising employee and the injured employee; (2) relative control over the employee's situation; (3) the degree to which the employee's conduct is voluntary on his part; (4) alternatives available to the employee; (5) obviousness of the danger; and (6) relative ability to eliminate the danger." 349 So.2d at 1362.
Although some portions of the Pearson and Miller criteria appear applicable to the facts of this case, under the specific circumstances before us we cannot say the trial court was "clearly wrong" in finding that Talluto neither was contributorily negligent nor assumed the risk. See Arceneaux v. Domingue, supra. Patchen had given a firm order to Talluto and Rumore to move the tables "now". They exercised their "reasonable alternative" of asking for assistance in order to eliminate or minimize the risk, but were refused. While they realized that turning the table over in confined quarters and under awkward conditions without additional assistance involved a considerable risk of injury, their conduct in proceeding to lift the tables under these circumstances was not entirely voluntary, but rather was compelled by a direct and reiterated order by their supervisor. We find no manifest error in the trial court's conclusion that Talluto was free of contributory negligence and assumption of the risk. Canter v. Koehring Company, supra; Arceneaux v. Domingue, supra.
Defendants-appellants Patchen, Ballard and their insurer assert as further errors the trial judge's award of general damages *626 in the amount of $120,000 and of future lost wages in the amount of $153,817. (The award of past lost wages, in the amount of $9,833, is not appealed.) They contend that $20,000 is the most that should have been awarded for general damages, and that plaintiff has not proven his total and permanent disability sufficiently to justify an award for future lost wages.
The current standard for appellate review of damage awards has been clearly set forth in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976):
"[B]efore a Court of Appeal can disturb an award made by a trial court . . . the record must clearly reveal that the trier of fact abused its discretion in making its award. [Citations omitted.] Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. [Citations omitted.] It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence." 341 So.2d 335.
See also Bitoun v. Landry, 302 So.2d 278 (La.1974); Anderson v. Welding Testing Laboratory, Inc., 304 So.2d 351 (La.1974).
As to the award for pain and suffering, plaintiff underwent two separate operations. The photograph submitted into evidence shows that he was left with very visible and angry-looking scars. The trial court's own examination of plaintiff's wrist and hand while plaintiff was on the witness stand revealed a pulsating "balloon" or bubble in plaintiff's skin, caused by a swollen artery, and that plaintiff did not appear to have full flexion or full extension. Dr. Hoerner testified that although he could find no medical reason why plaintiff should still be having pain and difficulty in using his wrist and hand, plaintiff had always been a cooperative and apparently truthful patient. After the second operation, plaintiff was left with a permanent loss of sensation on the back of his right hand. The doctor testified that although this loss of sensation should not affect plaintiff's ability to perform his job duties, plaintiff needed to be careful because he could injure himself without being aware of it. Plaintiff himself testified that he had once burned the back of his hand on a stove without being aware of it because he had no sensation in that area of his hand.
In addition, the plaintiff was left with a 15-to-20 percent permanent disability of his right upper extremity. The trial court also took into consideration the fact that plaintiff, who testified that formerly he had been very active in amateur sports such as baseball and football, would suffer an anatomical and functional loss which limit or prohibit his participation in such sports in the future.
As to future lost wages, Melville S. Wolfson, an expert in the field of labor economics, testified on plaintiff's behalf as to lost wages. Wolfson concluded that plaintiff's future lost wages would be $153,817. He computed this by taking the difference between $5.61 (the hourly wage plaintiff would have been earning in his former position at time of trial) and $3.40 (the lowest hourly wage paid at Martin Marietta, assuming plaintiff were to be rehired by them as a handicapped worker). The difference between these two figures was $2.21. The economic expert then multiplied $2.21 by 2,008 (the number of hours plaintiff had worked in the calendar year preceding his injury). The yearly difference was $4,437. Taking into consideration the Martin Marietta history of regular and periodic wage increases he used a figure of 3% for wage increases and 3% for decrease in purchasing power, and he used a discount rate of 5%. The figure at which he then arrived as future lost wages in the remaining 31.4 years of his work-life expectancy was $153,817.[6] This calculation was based on the *627 assumption that plaintiff would be unable to return to the job he was doing at the time of accident, and further that plaintiff would be unable to find a job in any capacity that would pay the equivalent of his wages as a spray foam insulation mechanic. Dr. Wolfson conceded, however, that in 1970 an average person of plaintiff's age and education in Louisiana earned about $12,000.
Alex Wilcox, manager of employee and labor relations at Martin Marietta, testified that the lowest-paid category of worker at the company was the helper position, at $3.40 an hour. He stated that most of these were manual labor positions. He also testified that plaintiff's former position, Mechanic A Insulation, was a job connected with federal government contracts regarding construction of fuel tanks for the space shuttle. To his knowledge, the contracts were to expire in the last quarter of 1978; if the contracts were not renewed, plaintiff's position and others connected with that particular program would be abolished. However, he testified that there were other jobs in the area for spray foam insulation mechanics, noting that he knew such jobs were available because Martin Marietta had been doing wage surveys for contract preparation.
Wilcox noted that Talluto had been fired from Marietta in February 1977 because he had overstayed his leave of absence, without requesting a further extension of leave, and because the last letter the company had received from Dr. Hoerner stated that plaintiff could return to work at light duty. Wilcox stated that upon expiration of a leave, if the employee does not request an extension, the company assumes he is voluntarily terminating his employment. Talluto had requested his original leave of absence on August 2, 1976 and renewed it by written request six times, covering the period August 2, 1976 through January 30, 1977. He was terminated on February 2, 1977, when he failed to request a further extension.
Wilcox testified that the company does hire handicapped people. Although to his knowledge there were no one-armed employees, he stated that the company would have made a concerted effort to place Talluto in a job at his current wage, although he could not guarantee that they could have placed him.
Among the documents Wilcox brought to court with him and which were introduced into evidence was one called "Employee Change Notice." This had been executed in connection with Talluto's termination and bore the notations, "overstayed leave of absence," "quit without notice," and not okay for rehire," Wilcox testified that "not okay for rehire" is used for all employees who quit without notice. He stated that, without extenuating circumstances, Talluto would not have been rehired.
It is apparent that the trial judge weighed plaintiff's testimony far too heavily, in the area of continuing pain and disability, in contrast to that of Dr. Hoerner. Although the trial judge specifically rejected that portion of Dr. Hoerner's testimony which was unfavorable, rejected unfavorable evidence does not fulfill a plaintiff's burden of proof, and plaintiff's assertion of continuing pain and disability were therefore unsupported by any medical evidence. Thus, although the evidence indicated that plaintiff would be permanently disabled, plaintiff simply did not show by a preponderance of the evidence that he would also be totally disabled. For purposes of future wages, the investigation must center on whether plaintiff's permanent partial disability will impair his earning capacity.
Dr. Hoerner's estimate of 15-to-20 percent permanent partial disability extended to the entire upper right extremity. Obviously, certain side effects of this disability necessarily would affect plaintiff's ability to earn a living in the future, and Dr. Hoerner opined he could not do sustained heavy labor, although he could perform any fine movements with the hand, and any of the mechanical tasks of the semi-skilled work he did prior to the accident. Moreover, *628 Dr. Hoerner's testimony that plaintiff's present disability would decrease with more intensive use of his hand is important, and must be given weight. In addition, plaintiff has education, training and experience that would make him eligible for other jobs besides that in which he was injured, and he has not shown that the disability in his right arm will bar him from other jobs such as he formerly had (i. e., claims adjuster, clerical work.)
"An award for loss of future earnings cannot be made on any scientific basis; neither can it be determined with mathematical certainty. However, where it appears reasonably certain and probable that a loss of earning capacity will be experienced, the courts will exercise a sound discretion and award such recovery therefor as appears just and fair to both litigants under the circumstances. "Courville v. B & B Engineering and Supply Company, 230 So.2d 377 at 382 (La.App. 1st Cir. 1969).
The medical evidence does not establish that plaintiff's future earning capability has been damaged to the extent that he will never be able to earn wages at a rate approaching that which he previously earned. In comparing what, according to the record, plaintiff obviously is no longer able to do to earn a living, with what he will be able to do after maximum recovery, we find that the award of $153,817 was not supported by the medical evidence. Furthermore, the trial court's overevaluation of plaintiff's complaints which were unsupported by medical evidence had to influence the amount of the awards for pain and suffering and for permanent disability.
Accordingly, the overall awards must be set aside as not supported by the evidence. We amend the judgment to grant a total award of $125,000, apportioned as follows: $75,000 for pain and suffering; $9,833.00 for loss of wages up to time of trial; $40,167.00 for loss of earning capacity.
For these reasons, we amend the judgment of the trial court to decrease the award to $125,000 and to eliminate the adjudication of workmen's compensation liability.
In all other respects, the judgment of the trial court is affirmed.
AMENDED AND AFFIRMED.
REDMANN, J., dissents in part.
REDMANN, Judge, dissenting in part.
Concurring in the resolution of the difficult liability question and in the conclusion that the awards for general damages and loss of future earnings were excessive and in their reduction, I would further reduce quantum to a fraction of the majority's figure.
NOTES
[1] R.S. 23:1032 was amended, effective October 1, 1976, to make workmen's compensation an injured employee's exclusive remedy in claims against "executive officers," thus barring "executive officer" tort suits. The tort defendants herein had asserted the amendment as a bar in an exception of no right or no cause of action, which was overruled by the trial court and which has not been reasserted on appeal. However, because plaintiff was injured on March 5, 1976, his right of action arose prior to the effective date of the amendment and accordingly his suit is not barred. See Green v. Liberty Mutual Insurance Co., 352 So.2d 366 (La.App. 4th Cir. 1977), writ refused Jan. 30, 1978.
[2] Plaintiff had been receiving workmen's compensation benefits in the amount of $85.00 per week from August 6, 1976 through February 18, 1977. After February 18, 1977 payment of benefits was suspended by the compensation insurer. Thus, plaintiff's petition of March 4, 1977 (as amended) prayed for workmen's compensation benefits in the alternative. However, the compensation insurer voluntarily reinstated benefits on June 27, 1977.
[3] The actual weight of the tables was never clearly established. Estimates by the witnesses varied between 100 pounds and 250 pounds. The accident report prepared by the Martin Marietta safety engineer stated the weight at 250 pounds. The tables' dimensions were approximately 6 feet long by 3 feet wide by 3 feet high.
[4] It was 3:30 p. m. on a Friday afternoon, and the shift ended at 3:48 p. m.
[5] A tendonitis or inflammation of the extensor tendons of the thumb.
[6] Although this figure does not appear in the record, the difference of $4,437 for 31.4 years, discounted at 5% but without factors for wages increases and inflation, would yield a sum of slightly over $69,000.